IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DEBORAH E. BROWN, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | CIVIL NO. 07-1132 (JBS) |
| v. | |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **OPINION** |
| Defendant. | |

APPEARANCES:

Robert A. Petruzzelli, Esquire
Jacobs, Schwalbe & Petruzzelli, Attorneys at Law
10 Melrose Ave., Suite 340
Cherry Hill, NJ 08003
    Attorney for Plaintiff

Christopher J. Christie
UNITED STATES ATTORNEY
    By:  Maria Fragassi Santangelo
         Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Suite 3904
New York, NY 10278
    Attorney for Defendant

**SIMANDLE**, District Judge:

    This matter comes before the Court pursuant to Section

205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g)

(2006), to review the final decision of the Commissioner of the

Social Security Administration denying the application of

Claimant Deborah E. Brown ("Mrs. Brown" or "Claimant") for
Disability Insurance Benefits ("DIB") under Title II of the
Social Security Act.  See 42 U.S.C. §§ 401-34 (2006).  Mrs. Brown
filed for DIB on March 10, 2003, alleging she has been disabled
since December 24, 2002, due to constant pain in her back, left
leg and left hip.  (R. at 140.)  Claimant urges this Court to
reverse the administrative decision and award Claimant benefits,
or alternatively, to vacate the administrative decision and
remand the case to the Commissioner for an award of benefits.

At issue in this case is whether there is substantial
evidence in the record to support the determination of the
Administrative Law Judge ("ALJ") that Claimant does not qualify
as "disabled" under the Social Security Act.  This Court must
therefore assess whether, in light of the medical evidence and
relevant testimony, the ALJ properly assessed Claimant's residual
functional capacity to perform her past relevant work.  In
answering that question, this Court must assess 1) whether the
ALJ properly assessed the credibility of Claimant's complaints of
pain, 2) whether the ALJ afforded appropriate deference to the
opinion of Claimant's treating physician and 3) whether the ALJ
conducted a proper function-by-function assessment of Claimant's
work-related abilities.

The Court has considered the submissions of the parties pursuant to Local Civil Rule 9.1.  Because the ALJ's decision fails to consider whether Claimant's migraine headaches and trigeminal neuralgia[1] would impact her ability to perform work-related functions on a regular and continuing basis pursuant to 20 C.F.R. §§ 416.945(b)-(d) and 404.145(b)-(d) in performing the function-by-function assessment at Step Four of the analysis, the Court will remand to the ALJ to reconsider his opinion in accordance with the reasoning set out in this decision.

**I.  <u>STANDARD OF REVIEW</u>**

**A.     <u>Standard for Judicial Review</u>**

Under 42 U.S.C. § 405(g), Congress provided for judicial review of the Commissioner's decision to deny a claimant's application for Disability Insurance Benefits.  <u>See</u> <u>Ventura v. Shalala</u>, 55 F.3d 900, 901 (3d Cir. 1995).  A reviewing court must uphold the Commissioner's factual decisions where they are supported by "substantial evidence."  42 U.S.C. §§ 405(g),

---

[1]  Trigeminal neuralgia is a condition which causes severe, paroxysmal bursts of pain in one or more branches of the trigeminal nerve, which are often induced by touching trigger points in or about the mouth.  <u>See</u> Stedman's Online Medical Dictionary, http://www.stedmans.com.

3

1383(c)(3); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001).   Substantial evidence means more than "a mere scintilla." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).   It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   <u>Id.</u>   The inquiry is not whether the reviewing court would have made the same determination, but whether the Commissioner's conclusion was reasonable.   <u>See</u> <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988).   Indeed, the "substantial evidence standard is deferential and includes deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence."   <u>Shaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 431 (3d Cir. 1999).

A reviewing court has a duty to review the evidence in its totality.   <u>See</u> <u>Daring v. Heckler</u>, 727 F.2d 64, 70 (3d Cir. 1984). "[A] court must 'take into account whatever in the record fairly detracts from [a particular piece of evidence's] weight.'" <u>Schonewolf v. Callahan</u>, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting <u>Willbanks v. Sec'y of Health & Human Servs.</u>, 847 F.2d 301, 303 (6th Cir. 1988) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951))).

The ALJ has a duty "to develop the record fully and fairly." <u>Thompson v. Sullivan</u>, 878 F.2d 1108, 1110 (8th Cir. 1089).   The

4

ALJ must set out a specific factual basis for each finding.
Baerga v. Richardson, 500 F.2d 309 (3d Cir. 1974), cert. denied,
420 U.S. 931 (1975); Boot v. Heckler, 618 F. Supp. 76, 79 (D.
Del. 1985).  Simply referring to the "record" is insufficient.
Abshire v. Bowen, 662 F. Supp. 8 (E.D. Pa. 1986).  However, an
ALJ need not explicitly discuss every piece of relevant evidence
in his or her decision.  See Fargnoli, 247 F.3d at 42.
Additionally, the ALJ "must adequately explain in the record
[the] reasons for rejecting or discrediting competent evidence,"
Ogden v. Bowen, 677 F. Supp 273, 278 (M.D. Pa. 1987) (citing
Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)), including
medical evidence and all non-medical evidence presented.  Burnett
v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000).

     The Third Circuit has held that access to the Commissioner's
reasoning is indeed essential to a meaningful court review:

          Unless the [Commissioner] has analyzed all
          evidence and has sufficiently explained the
          weight he has given to obviously probative
          exhibits, to say that his decision is
          supported by substantial evidence approaches
          an abdication of the court's duty to
          scrutinize the record as a whole to determine
          whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (citing
Arnold v. Sec'y of Health, Educ. & Welfare, 567 F.2d 258, 259
(4th Cir. 1977)).  A district court is not "empowered to weigh

the evidence or substitute its conclusions for those of the fact-finder." <u>Williams v. Sullivan</u>, 970 F.2d 1178, 1182 (3d Cir. 1992).

**B.    Standard for Disability Insurance Benefits under Title II of the Social Security Act**

The Social Security Act defines "disability" for purposes of entitlement to DIB as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d), 1382c(a)(3)(B) (2006). Under this definition, "a claimant qualifies as disabled only if [that claimant's] physical or mental impairments are of such severity that [the claimant] is not only unable to do his [or her] previous work, but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . ." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B) (2006). Impairments must be considered in combination when making a disability determination. <u>Burnam v. Schweiker</u>, 682 F.2d 45 6, 458 (3d. Cir. 1982).

The Commissioner has promulgated regulations for determining disability that require application of a five-step sequential

analysis.  20 C.F.R. § 404.1520 (2006).  This process is
summarized as follows:

1.  If currently is engaged in substantial gainful
    employment, the claimant will be found "not disabled."

2.  If not suffering from a "severe impairment," the
    claimant will be found "not disabled."

3.  If the severe impairment meets or equals a listed
    impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1
    and has lasted or is expected to last for a continuous
    period of at least twelve months, the claimant will be
    found "disabled."

4.  If able to still perform work done in the past despite
    the severe impairment, the claimant will be found "not
    disabled."

5.  Finally, the Commissioner will consider the claimant's
    ability to perform work, age, education, and past work
    experience to determine whether or not the claimant is
    capable of performing other work which exists in the
    national economy.  If incapable, the claimant will be
    found "disabled."  If capable, the claimant will be
    found "not disabled."

20 C.F.R. § 404.1520(b)-(f).  Entitlement to benefits is

therefore dependent upon finding the claimant is incapable of

performing work in the national economy.

This analysis involves a shifting burden of proof.  Wallace,

722 F.2d at 1153.  In the first four steps of the analysis, the

burden is on the claimant to prove every element of his claim by

a preponderance of the evidence.  Id.  In the final step, the

Commissioner bears the burden of proving that work is available

for the claimant: "Once a claimant has proved that he is unable

to perform his former job, the burden shifts to the Commissioner
to prove that there is some other kind of substantial gainful
employment he is able to perform." Kangas v. Bowen, 823 F.2d
775, 777 (3d Cir. 1987) (citing Chicager v. Califano, 574 F.2d
161 (3d Cir. 1978)).

## II. BACKGROUND

### A.   Procedural History

On March 10, 2003, Claimant filed an application for DIB,
alleging a disability onset date of December 24, 2002 (R. at 111-
13), due to constant pain in her back, left leg and hip.  (R. at
140).  The Social Security Administration ("SSA") denied the
claim both initially, (R. at 53-57), and on reconsideration. (R.
at 60-62).  On December 2, 2003, Claimant subsequently filed a
Request for an Administrative Hearing, (R. at 63), which was held
before ALJ Linda Bernstein on January 27, 2005.  (R. at 71, 402-
32).  The ALJ issued a denial of benefits on March 31, 2005, (R.
at 36-47), at which time Claimant filed a request for review.
(R. at 86).  On September 16, 2005, the Appeals Council vacated
the ALJ's decision, citing, inter alia, the ALJ's failure to
conduct a function-by-function assessment of the case.  (R. at
18, 48-52.)  The Appeals Council then remanded the case to the
ALJ for further evaluation.  (Id.)

8

The remand hearing was held on April 20, 2006 before AlJ Mark Barrett (R. at 433-490.)  On June 30, 2006, the ALJ issued a decision ruling that Claimant was not entitled to DIB because she was not disabled within the meaning of the Social Security Act. (R. at 19, 25.)  The ALJ found that Claimant has not engaged in substantial gainful activity since her alleged date of disability, (R. at 25), and concluded that Claimant's cervical and lumbar degenerative arthritis, trigeminal neuralgia, migraine headaches, hypertension and right carpal tunnel syndrome are severe impairments, based on the requirements in federal regulations 20 CFR § 404.1520(c).  (Id.)  However, he also found that these impairments do not meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4. (Id.)

After reviewing all the evidence in the record, the ALJ concluded that although the Claimant has some subjective symptoms, they are not of the intensity, frequency, or duration alleged. (R. at 23.)  Specifically, the ALJ found that Claimant's alleged functional limitations are not totally credible, in light of the medical findings and Claimant's alleged high level of daily activities.  (R. at 23-24.)  Accordingly, the ALJ found that Claimant has the residual functional capacity to lift and/or carry twenty pounds occasionally and ten pounds frequently; the

ability to stand and/or walk at least two hours and sit for about six hours in an eight hour workday; and unlimited use of her upper and lower extremities for pushing/pulling, other than as shown for lifting/carrying.  (R. 25-26.)  Furthermore, the ALJ found that although Claimant can never climb ladders/ropes/scaffolds, she is able to occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl; and she should avoid concentrated exposure to extremes in temperatures, wetness/humidity, noise/vibrations, excessive pollutants, and hazards such as moving machinery and unprotected heights (R. at 26.)

Finally, in finding that the Claimant's past relevant work as a Social Worker/Case Worker does not require the performance of work-related activities precluded by her residual functional capacity ("RFC"), and that the claimant's medically determinable impairments do not prevent her from performing her past relevant work, the ALJ was able to conclude that Claimant was not "disabled," as defined in the Social Security Act, at any time through the date of the decision and, thus, was not entitled to disability insurance benefits.  (Id.)

After the denial of benefits was issued on June 30, 2006 (R. at 15-26), Claimant filed another Request for Review (R. at 13-14), which was subsequently denied on January 26, 2007 by the

10

Appeals Council.  (R. at 7-9).  The Commissioner's June 30, 2006 decision therefore became the final decision of the Commissioner. On March 9, 2007, Claimant timely filed the present action with this Court, seeking review of the Commissioner's determination. [Docket Item No. 1.]

**B. Evidence in the Record**

    1. <u>Medical Evidence Prior to Disability Onset Date</u>

As the Court noted, <u>supra</u>, Claimant alleges a disability onset date of December 4, 2002, resulting from lower back, left leg and left hip pain.  (R. at 140.)  Mrs. Brown's medical records reveal that she developed left leg pain in November 2000 and was subsequently diagnosed with herniated nucleus pulposus[2] at the L5-S1 level to the left with associated left lower extremity radiculopathy.[3]  (R. at 208-09.)  In August 2001, she

---

[2]  Nucleus pulposus is the soft fibrocartilage central portion of the intervertebral disk regarded as a derivative of the notochord.  <u>See</u> Stedman's Online Medical Dictionary, http://www.stedmans.com.

[3]  Radiculopathy is a disorder of the spinal nerve roots, which results in pain.  <u>See</u> Stedman's Online Medical Dictionary, http://www.stedmans.com.

underwent a microdiskectomy[4] and hemilaminotomy[5] at L5-S1,
followed by a course of physical therapy.  (R. at 198, 200, 233-
34.)  At a post-operative visit with Dr. Ponizo, her treating
physician, Dr. Ponzio reported that Mrs. Brown's numbness was
gone, that she had good motor and reflex functions and that she
had made "good progress" post surgery.  (R. at 203.)  Dr. Ponzio
also noted that Claimant had stopped using pain medications.  (R.
at 203).  In August 2001, Mrs. Brown also underwent selective
nerve root block in her lower back at vertebral disc positions
L4-5 and L5-S1.  (R. at 195). In a follow-up report dated
November 6, 2002, Dr. Ponzio wrote that Mrs. Brown showed an 89%
improvement after the root block.  (R. at 195.)  In November of
2002, Jeffrey Polcer, D.O., a pain management specialist,
reported that Mrs. Brown's back and leg pain significantly
improved following the nerve root block.  (R. at 262).

Dr. Frank Wilczynski, Claimant's family practitioner,
submitted a State of New Jersey Medical Report and office notes
in August 2002, (R. at 224-25), which indicated that Mrs. Brown

---

[4] Microdiskectomy is the debulking of a herniated nucleus
pulposus using an operating microscope or loupe for
magnification.  See The Free Dictionary,
http://medical-dictionary.thefreedictionary.com/microdiskectomy.

[5] Hemilaminotomy is a surgical division of half of one or more
vertebral laminae.  See The Free Dictionary,
http://medical-dictionary.thefreedictionary.com/laminotomy.

was followed for diagnoses of sinusitis, chronic headaches, hypertension, chronic lumbar pain, and herniated disc of the cervical spine. (Id.)  He stated he was unable to form an opinion at that time as to whether Mrs. Brown was totally and permanently disabled and unable to perform her job duties, as there was a possibility that her condition would improve. (R. at 225.)


    2.   Medical Evidence Post Disability Onset Date

        a.   Jose Diaz-Jimenez: Non-treating Physician

    Dr. Jose Diaz-Jimenez examined Mrs. Brown during a consultative evaluation on June 16, 2003.  (R. at 270.)  At the examination, she complained of low back pain, left leg pain and hip pain.  (Id.)  Dr. Diaz-Jimenez noted that she had a history of intermittent back pain, beginning in 1987 for which cortisone injections provided relief.  (Id.)  Mrs. Brown reported, however, that in 1995, the pain became constant, and the injections were no longer effective.  (Id.)  Additionally, a lumbar discectomy,[6] performed on August 6, 2001, did help to decrease her low back

_____

[6] A discectomy is an excision, in part or whole, of an intervertebral disk.  See Stedman's Online Medical Dictionary, http://www.stedmans.com.

13

pain.  (R. at 271.)  Claimant also stated that after the discectomy, she developed radiculopathy. (Id.)  She complained that due to her back pain she was unable to do any laundry or bend at the waist.  (Id.)

Dr. Diaz-Jimenez's physical examination revealed that Claimant's gait was normal, and she did not require assistive devices.  (R. at 272.)  Her range of motion of the neck, shoulders, wrists, elbows and hands were within normal limits. (Id.)  Her muscle strength was 4/5 on biceps, triceps and right grip, while she had a normal grip on the left. (Id.)  Her fine and gross manipulation was also within normal limits.  (Id.) Although a straight leg raising test revealed lumbar pain when elevating the left leg to forty-five degrees and when elevating the right leg to eighty-five degrees, Dr. Diaz-Jimenez noted that Claimant appeared comfortable during the examination.  (R. at 273.)  Mrs. Brown was only able to squat to half of the normal level due to back pain that radiated down her left leg.  (Id.) She was able to flex at the waist to eighty degrees with moderate ease and minimal back pain.  (Id.)  Her lower extremities had normal bilateral reflexes and no muscle atrophy was discovered. (Id.)  Dr. Diaz-Jimenez noted that Mrs. Brown was able to walk on her heels and toes with some difficulty, due to a healing left foot fracture.  (Id.)  However, Mrs. Brown stated that she would

14

not normally have difficulty walking.  (Id.)  Dr. Diaz-Jimenez's review of an EMG report performed on October 2, 2002 revealed findings suggestive of L4 radiculopathy on the left that was chronic in nature.  (Id.)

Dr. Diaz-Jimenez diagnosed Claimant with chronic low back pain and associated left leg radiculopathy, and new onset of neck pain with reported bulging disc in the cervical spine, as well as hip pain.  (Id.)  He also noted that her other medical problems included hypertension, migraines and chronic sinus problems.  (R. at 274.)

                    b.   Dr. D. Schneider: Non-treating Physician

On August 26, 2003, Dr. Schneider assessed Claimant's residual functional capacity after reviewing her medical records. (R. at 277-84.)  In his opinion, Mrs. Brown could lift/carry up to twenty pounds, stand/walk for at least two hours at a time, sit for approximately six hours, and push/pull without difficulty.  (R. at 278.)  Additionally, he found that she was capable of climbing ramps and stairs and could occasionally balance, stoop, kneel, crouch, and crawl.  (R. at 279.)  Finally, Dr. Schneider noted that while Mrs. Brown had no manipulative, visual or communicative limitations, (R. at 280-81), she did have various environmental limitations, which required her to avoid

15

exposure to extreme temperatures, humidity, fumes, odors, dusts and poor ventilation.  (R. at 281).

### c.  **Dr. Ponzio: Treating Physician**

Dr. Robert Ponzio has been Claimant's orthopedist since July 25, 2001, at which time he diagnosed her with herniated nucleus pulposus, at the L5-S1 level to the left, with associated left lower extremity radiculopathy, as discussed supra. (R. at 209, 306).  Dr. Ponzio's office notes for May 7, 2003 state that Mrs. Brown was complaining of neck pain radiating into her right upper extremity.  (R. at 193.)  At that time, he diagnosed her with herniated nucleus pulposus of the cervical spine, right upper extremity radiculopathy and diminished lumbar motion, and recommended an MRI of the cervical spine.  (R. at 193-94.)  On June 4, 2003, Dr. Ponzio noted that the MRI of the cervical spine revealed a herniated disc at C3-4 and referred Mrs. Brown for pain management and physical therapy and prescribed her Celebrex. (R. at 192.)  Dr. Ponzio also found that Mrs. Brown had right shoulder impingement[7] and administered a steroid injection to her

---

[7] Shoulder impingement results from pressure on the rotator cuff from part of the shoulder blade (scapula) as the arm is lifted. As the arm is lifted, the front edge of the shoulder blade  rubs, or "impinges" on, the surface of the rotator cuff. This causes pain and limits movement. See The American Academy of Orthopedic Surgeons, "Shoulder Impingement," http://orthoinfo.aaos.org/topic.cfm?topic=A00032.

right shoulder.  (Id.)  On July 9, 2003 Dr. Ponzio diagnosed Mrs. Brown with positive Hawkins impingement of the right shoulder and administered another steroid injection.  (R. at 191.)

At an office visit on September 3, 2003, Dr. Ponzio noted that Mrs. Brown's symptoms had improved after the shoulder injection, although he found that surgery might be warranted if they worsened again.  (R. at 300.)  On December 17, 2003, after Mrs. Brown reported right shoulder, neck, and back pain, with low back pain flaring every two or three months, Dr. Ponzio recommended repeat cervical epidurals with Dr. Polcer, a pain management specialist; physical therapy for the low back for four weeks; and Bextra and Vicodin at bedtime.  (R. at 298.)

On December 17, 2003, Dr. Ponzio also completed a Physical Residual Functional Capacity Questionnaire evaluating Mrs. Brown, and listing her diagnoses as degenerative disc disease of the lumbar spine, with herniated disc and left lower extremity radiculopathy, herniated disc of the cervical spine and right shoulder impingement.  (R. at 306.)  He further noted that Mrs. Brown had pain in the cervical spine with rotation and lumbar spine pain with extension, which varied from three to eight on a ten point scale.  (Id.)

---

17

Dr. Ponzio opined that Mrs. Brown was able to lift/carry ten pounds occasionally, stand and/or walk less than two hours (thirty minutes without interruption) and sit less than two hours (thirty minutes without interruption) in an eight-hour workday. (R. at 308.)  He further believed that she was unable to stoop or crouch and that she was significantly limited in her ability to use her right upper extremity for reaching.  (R. at 309-10.) Additionally, he found that Claimant was completely unable to use her right hand to grasp, turn, and twist objects and to use her right and left fingers for fine manipulation.  He did find, however, that she was fully capable of using her left hand to grasp, turn and twist objects.  (R. at 369.)  He stated that Mrs. Brown would need unscheduled breaks of five to ten minutes after every two-hour span of work during an eight-hour workday, and he also explained that her pain often interfered with her ability to maintain attention and concentration.  (R. at 307-08.)

On January 14, 2004, Dr. Ponzio diagnosed an improved impingement syndrome, (R. at 297), and by February 11, 2004, Dr. Ponzio noted that Mrs. Brown reported improvement following lumbar injections.  (R. at 295).

      **e.**   **Dr. Maria Chiara Carta: Treating Physician**

Dr. Maria Chiara Carta, a neurologist, evaluated Mrs. Brown on March 26, 2004, when Claimant complained of chronic pain in

the cervical and lumbar spines, paresthesias radiating into the ulnar side of the right upper extremity and constant bifrontal headaches, accompanied by nausea and photophobia when at their worst, for which she was taking at least three tablets of Fioricet daily.  (R. at 367.)  Dr. Carta reviewed an EMG conducted on May 27, 2003, which revealed a normal study of the right upper extremity.  (R. at 364-67.)  A motor examination revealed normal muscle strength, tone, coordination, station and gait.  (R. at 368.)  Dr. Carta concluded that Mrs. Brown presented with a clinical history consistent with chronic cervical and lumbar pain; ischemic white matter disease, most likely related to hypertension; and migraine-type headaches, as well as analgesic rebound headaches from excessive use of Fioricet.  (Id.)  Dr. Carta prescribed Mrs. Brown Neurontin for prophylactic headache control and advised her to take a baby aspirin with dinner and to cease smoking.  (Id.)

    e.   Dr. John P. Nolan: Non-treating Physician

Dr. Nolan consultatively evaluated Claimant, who appeared for electrodiagnostic testing of the upper extremities on November 14, 2005.  (R. at 386.)  At that time, Mrs. Brown complained of pain and numbness in her right upper extremity and reported having been previously diagnosed with carpal tunnel syndrome, although she had not undergone surgery for that

condition.  (Id.)  The tests revealed evidence of mild median nerve slowing at the right wrist, suggestive of mild right carpal tunnel syndrome, as well as evidence of very mild median nerve swelling of the left wrist, suggestive of very mild left carpal tunnel syndrome.  (Id.)  There was no evidence that suggested an acute or chronic cervical radiculopathy involving the right or left upper extremities, or any underlying peripheral polyneuropathy.[8]  (R. at 386-87.)

g.  Dr. T..J. Citta-Pietrolungo: Non-treating Physician

During a consultative examination performed at the request of the State Agency on November 3, 3005, Dr. Citta-Pietrolungo noted that Claimant complained of back pain radiating down the left leg, pain in the right palm and chronic migraine headaches, due to hypertension.  (R. at 389.)  Examination revealed that Mrs. Brown's neck and bilateral upper extremities had full range of motion.  (R. at 390.)  Her strength in her left shoulder was normal and her strength in her right shoulder was a 4+/5.  (Id.) Mrs. Brown's lower extremities had full range of motion in the hips, knees, and ankles and all major muscle groups tested had normal strength. (Id.)  Although there was mild, increased lumbar

---

[8]  Polyneuropathy is neuropathy of several peripheral nerves simultaneously.  See The Free Dictionary, http://medical-dictionary.thefreedictionary.com/polyneuropathy.

tightness in the paraspinal muscles, the straight leg raise test was negative. (Id.) Mrs. Brown was able to walk independently without an assistive device and she was able to heel walk, toe walk, squat and recover. (Id.) Her gross manipulation and fine coordination were intact and her strength was normal for grip and pinch in both hands. (Id.) Dr. Citta-Pietrolungo ultimately concluded that Mrs. Brown suffered from degenerative arthritis, trigeminal neuralgia, migraine headaches, hypertension and right carpal tunnel syndrome. (R. at 391.)

On that same day, Dr. Citta-Pietrolungo also completed a medical source statement regarding Mrs. Brown's ability to perform work-related activities. (R. at 395-398.) The doctor's conclusions were as follows: Claimant can lift/carry up to ten pounds occasionally and less than ten pounds frequently, she is unlimited in her ability to stand, walk, or sit, and she is limited in her ability to push/pull with her upper extremities due to right shoulder arthritis, which had been arthroscopically repaired. (R. at 395-96.) Additionally, the doctor found that Claimant can occasionally climb, balance, kneel, crouch, crawl, and stoop. (R. at 396.) Furthermore, she was unlimited in her ability to perform manipulative activities, such as reaching, handling, fingering and feeling. (R. at 397.) Finally, Dr.

21

Citta-Pietrolungo concluded that Claimant had no environmental limitations.  (<u>Id</u>.)

    2.  <u>Non-medical and Vocational Evidence</u>

        a.  <u>Claimant's Testimony</u>

Mrs. Brown formerly worked as a Case Worker for the Camden County Board of Social Services from 1979 to 1999 (R. at 407.) This position required her to both sit and stand and carry case folders.  (R. at 407-409.)  Beginning in 1999 until she stopped working in 2002, Mrs. Brown worked as a Case Manager for Social Services, (R. at 407), which involved sitting, standing, walking, working on a computer, carrying case folders, and interviewing clients.  (R. at 410-11).  Although Mrs. Brown estimated that she walked about six to six and a half hours per day in that job,[9] when asked to elaborate on when she would be walking or standing, she specified that she would go back and forth from her office to her supervisor's office at the end of the hall to drop of her folders, and that she would have to get up from her desk in order to meet a client to conduct an interview, which was then performed in a seated position.  (R. at 410.)  The number of interviews she actually conducted during a day varied according

_____

[9] This testimony, given at her hearing on January 27, 2005, appears to be inconsistent with her testimony given at her April 20, 2006 hearing, where Mrs. Brown stated that she sat at a desk all day.  (R. at 443.)

22

to the number of cancellations, so on some days she did not walk much at all.  (Id.)  Mrs. Brown testified that she stopped working in 2002 due to pain in her back, lower back and neck, which had started in the late 1980's.  (R. at 412.)  She further testified that it was her employer who suggested that she stop working and apply for pension disability.  (R. at 412-413.)

Mrs. Brown stated that she has chronic pain in her lower back, which radiates down her left leg, pain in her right shoulder and pain in her right hand (R. at 413-14.) Additionally, she noted that she suffers from trigeminal nerve damage in her face, diagnosed in April 2004, which causes episodes of radiating pain that shoots through her mouth into her head, affecting her right eye vision.  (R. at 415-16.)   She further testified that the nerve damage affects her balance, causing her to stumble.  (R. at 421.)  Mrs. Brown stated that she sometimes carries a cane, but that she was not using one on the date of the hearing.  (R. at 421.)

In order to control the pain Mrs. Brown experiences, she receives steroid injections approximately every four to five months.  (R. at 419, 457.)  At her hearing on January 27, 2005, Mrs. Brown stated that the relief the injections provide lasts four to five months.  (Id.)  However, in her April 20, 2006 hearing, Mrs. Brown stated that the relief only lasts one to two

23

months and then her pain returns to its baseline.  (R. at 467.)
Additionally, Mrs. Brown takes various medications, including
Percocet and Naproxyn for pain as needed, Latrell for
hypertension, Trileptal and Baclofen, for the trigeminal nerve
damage in her face, and Actified for acid reflux.  (R. at 420-21,
448-50.)  Some of her medications make her nauseous, (R. at 420),
while others cause drowsiness. (R. at 455.)

    With regard to her daily activities, Claimant stated that
while at home, she watches television, talks on the telephone,
and cooks dinner.  (R. at 423.)  She also is able to do laundry,
rinse and load dishes into the dishwasher.  (R. at 464.)  She
says that she is able to drive, but that when her pain is severe,
she does not drive at all.  (R. at 464.)  Additionally, Mrs.
Brown complained of right hand pain which causes her to have to
take breaks when writing out bills.  (R. at 452.)  She also
stated that she has difficulty using her right arm, such as in
lifting it to curl her hair.  (R. at 469-70.)  Although she is
able to curl her hair, she estimated the whole process, breaks
included, takes fifteen minutes.  (R. at 470.)

    At her hearing on January 27, 2005, Mrs. Brown testified
that she could walk four to five hours without having to take a
break, stand in one position for an hour before taking a break,
and sit in one position for up to an hour and a half before

having to get up to take a break.  (R. at 425-26.)  However, at
her hearing on April 20, 2006, Mrs. Brown testified that she can
only walk for about a block without taking a break, stand for up
to twenty minutes without taking a break to sit, and that she has
no real difficulty sitting, until she has to get up.  (R. at
452.)  She claims that she does not clean, because of trouble
bending over, and that she does not engage in any pushing or
pulling (although she does push a grocery cart) because she does
not want her back to go out.  (R. at 426-27.)  However, she is
able to load the groceries into the trunk of her car, and she
estimates that she can carry about five to ten pounds.  (R. at
454.)  She is also able to climb the stairs in her house, using
the railing.  (Id.)

    Mrs. Brown also complained of pain and swelling in her right
hand, although she stated she did have surgery on it in 2006,
which improved it slightly.  (R. at 456, 472.)  She testified
that she is able to pick up small objects, but could not do so
for more than five minutes without her hand hurting.  (R. at
473.)

    Mrs. Brown explained that she experiences migraine headaches
approximately once every two weeks and the headaches can last for
up to two days.  (R. 469.)  When she suffers from a migraine,
Mrs. Brown remains lying down in a dark room.  (R. at 469.)

25

b.   <u>Vocational Expert's Testimony</u>

Margaret Creno, a vocational expert, testified at the April
2006 hearing.  Ms. Creno testified that Claimant's past work as
an Eligibility Department Worker for the welfare department is
classified by the U.S. Department of Labor's Dictionary of
Occupational Titles (DOT) Code 195.267 as a skilled sedentary
position.  (R. at 477-78.)  She also testified that the position,
as Mrs. Brown performed it, would also be described as sedentary.
(R. at 478.)  Likewise, Mrs. Brown's past work as a Case Manager
is also classified as skilled, sedentary work.  (R. at 478.)  The
ALJ then presented the VE with three hypotheticals, based on the
conclusions of Dr. Schneider, Dr. Ponzio, and Dr. Citta-
Pietrolungo, respectively, as to the Claimant's functional
abilities and limitations.

In response to a hypothetical regarding an individual with
the capabilities and limitations as assessed by Dr. Schneider,
<u>supra</u>, the VE testified such an individual could perform
Claimant's past relevant jobs both as she performed them and as
they are performed in the national economy.  (R. at 479-89.)  In
response to a hypothetical regarding an individual with the
capabilities and limitations as assessed by Dr. Ponzio, <u>supra</u>,
the VE testified that such an individual could not return to
Claimant's past work nor could she return to any job in the

26

national or local economy.  (R. at 480-82.)  Finally, in response
to a hypothetical involving an individual with the capabilities
and limitations as assessed by Dr. Citta-Pietrolungo, supra, the
VE testified that such an individual could perform Claimant's
past relevant jobs both as she performed them and as they are
performed in the national economy.  (R. at 484.)

    The VE conceded that sedentary jobs, such as Claimant's past
relevant work, do require bilateral, manual dexterity.  (R. at
485-86.)  Thus, if the hypothetical individual had a dominant
right hand that was swollen and made it difficult to use the
right arm/hand, she would not be able to perform Claimant's past
relevant work, because she would lack the bilateral dexterity
needed to handle paperwork.  (Id.)  Furthermore, the VE testified
that if the hypothetical individual could only use her hands
occasionally, the individual would not be able to perform
Claimant's past relevant work, because most sedentary jobs
require frequent hand use and some even require continuous hand
use.  (R. at 487.)  Finally, the VE testified that if, in
addition to the restrictions Dr. Citta Pietrolungo's assessment
revealed, the individual suffered migraine headaches that would
cause her to miss an additional twelve days of work per year,
this would qualify as excessive absenteeism, and the individual
would not be able to maintain employment. (R. at 488-89.)

## III. DISCUSSION

### A.  Analysis

#### 1.  Whether the ALJ Properly Determined Claimant's Residual Functional Capacity at Step Four

The ALJ determined that Claimant retains the Residual Functional Capacity to perform the demands of sedentary work and, thus, is able to return to her past relevant work as a Social Worker/Case Worker (R. at 24-26).  Claimant argues that the ALJ erred in determining her RFC by 1)improperly dismissing her complaints of disabling pain and limitations as not credible to the degree alleged, (Pl.'s Br. at 8-16.), 2) declining to defer to Claimant's treating physician's (Dr. Ponzio) assessment of her functional limitations while instead giving substantial weight to a non-examining state agency physician's assessment, (Pl.'s Br. at 22), and 3) failing to conduct a function-by-function assessment of her work-related abilities in accordance with Social Security Ruling 96-8p (Pl.'s Br. at 19.)  Defendant argues that the ALJ's determination is reasonable in light of a thorough evaluation of the evidence.  (Def.'s Br. at 12, 20.) Although this Court agrees with the Defendant as to the first two issues, it agrees with Claimant as to the final issue, namely that the ALJ failed to conduct a proper function-by-function assessment of Mrs. Brown's work-related abilities.

28

a.   Whether the ALJ Properly Evaluated Claimant's
     Credibility with Regard to Her Complaints of
     Pain

The ALJ is required to give serious consideration to Plaintiff's subjective complaints of pain.  Welch v. Heckler, 808 F.2d 264, 270 (3d Cir. 1986).  Subjective complaints of pain, however, "do not in themselves constitute disability."  Green v. Schweiker, 749 F.2d 1066, 1070 (3d Cir. 1984); 20 C.F.R. § 404.1529(a).  Complaints of pain must be accompanied by medical signs that show that the plaintiff has a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged.  20 C.F.R. § 404.1529(a) (explaining that "statements about your pain or other symptoms will not alone establish that you are disabled").  See Bittel v. Richardson, 441 F.2d 1193, 1195 (3d Cir. 1971) (requiring plaintiff to meet burden of showing medical impairment to support subjective complaints of pain).  When a plaintiff's subjective complaints of pain indicate a greater severity of impairment than the objective medical evidence supports, the ALJ can give weight to factors such as the claimant's daily activities; duration, frequency and intensity of the symptom; type, dosage, effectiveness and side effects of medication; and any other treatment claimant uses or has used to relieve her pain or other symptoms.  20 C.F. R. § 404.1529(c)(3); SSR 96-7.

In making credibility determinations regarding the true
extent of the pain alleged by the claimant, "the ALJ has
discretion . . . to arrive at an independent judgment, in light
of medical and other evidence." Brown v. Schweiker, 562 F. Supp.
284, 287 (E.D. Pa. 1983) (quoting Bolton v. Sec'y of HHS, 504
F.Supp. 288, 291 (E.D.N.Y. 1980)).  In any case, the ALJ must
indicate the basis for conclusions that the claimant's testimony
is not credible.  See generally Cotter v. Harris, 642 F.2d 700
(3d Cir. 1981).  While an ALJ may look at a claimant's stated
ability to engage in hobbies, cooking, and driving in determining
that the complaints of pain are not credible, activities such as
school, hobbies, housework, or use of public transportation
cannot be used to show ability to engage in substantial gainful
activity.  Frankenfield v. Bowen, 861 F.2d 405, 408 (3d. Cir.
1988); Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981)
("Disability does not mean that a claimant must vegetate in a
dark room excluded from all forms of human and social activity.")
see also 20 C.F.R. § 404.1572(c) ("Generally, we do not consider
activities like taking care of yourself, household tasks,
hobbies, therapy, school attendance, club activities or social
programs to be substantial gainful activity.").

Where an ALJ properly determines the credibility of a
Claimant's subjective complaints of pain, the reviewing court

30

should not substitute its own determination of credibility for that of an ALJ who had the opportunity to observe a plaintiff in person.  See Weir v. Heckler, 734 F.2d 955, 962 (3rd Cir. 1984) (recognizing that great deference is given to an ALJ's determination of credibility).

In this case, the ALJ carefully considered Mrs. Brown's subjective complaints of pain by examining her testimony alongside all the medical evidence, ultimately concluding that Claimant's testimony seemed inconsistent with her daily activities and exaggerated as compared to the medical evidence. (R. at 23.)  Although Mrs. Brown complained of pain in her lower back, right shoulder and right hand, as well as frequent migraine headaches at the hearing (R. at 22), the ALJ noted her ability to perform daily activities despite her impairments, including doing laundry, rinsing dishes and going grocery shopping, where she can lift packages between five and ten pounds.  (R. at 22-23). Additionally, Mrs. Brown testified that she could write bills and curl her hair, although she did say these activities required breaks due to right hand pain.  (R. at 23.)  Although ability to engage in these types of activities does not connote an ability to engage in substantial gainful activity, see Frankenfield, 861 F.2d at 408, it certainly can be used by the ALJ in making a determination as to whether a claimant's allegations of disabling

31

pain are credible. <u>See</u> SSR 96-7 (permitting an ALJ to give weight to a claimant's daily activities when determining the credibility of a claimant's complaints of pain).

The ALJ's negative assessment of Mrs. Brown's credibility also finds support in the multiple inconsistencies between her testimony concerning her limitations due to physical pain and her limitations as assessed by her examining physicians.  (R. at 23-24.)  For example, although Mrs. Brown stated that she has difficulty getting up from a seated position, and that she will experience left leg pain after walking for only one block,[10] (R. at 22), Dr. Citta-Pietrolungo, Dr. Carta and Dr. Schneider all found that Claimant had no limitations in her ability to sit, stand or walk.  (R. at 21-22, 24, 277-84).  Furthermore, during an examination on November 4, 2005, Dr. Citta-Pietrolungo noted that Mrs. Brown was able to walk independently, and was able to squat and recover, seemingly contradicting Claimant's testimony that she has difficulty getting up from a seated position.  (R. at 22.)  Although both Dr. Diaz-Jimenez, in June 2003 and Dr. Ponzio, in December 2003, (R. at 21), reported that Mrs. Brown was unable to squat (R. at 20-21), because squatting was not

---

[10] Notably, this testimony itself is inconsistent from Mrs. Brown's prior testimony, discussed <u>supra</u>, where she stated she could walk four to five hours without taking a break.  (R. at 425-426.)

32

considered a limitation in all subsequent examinations, this strongly suggests an improvement of symptoms over time.

Similarly, although not expressly addressed in the ALJ's opinion, there are other examples of inconsistencies between Mrs. Brown's testimony and the medical evidence in the record that further bolster the reasonableness of the ALJ's credibility determination.  For instance, there is a marked contrast between the medical reports concerning Mrs. Brown's right carpal tunnel syndrome, which the ALJ noted that the doctors characterized as mild, (R. at 22), and Mrs. Brown's testimony regarding the extent of her right hand impairment.  (R. at 456, 472-73).  At her most recent hearing, Mrs. Brown complained of swelling and pain in her right hand, and stated that she had recently undergone surgery on her hand which had improved her symptoms slightly.  (R. at 456, 472.)  However, the record does not contain any evidence of this recent surgery, nor is there any evidence of Mrs. Brown complaining of swelling in her hand prior to the hearing.  Likewise, medical reports state that Mrs. Brown had no limitations in her ability to walk and stand, (R. at 20-22), and Dr. Citta even expressly noted that Mrs. Brown did not need the aid of assistive devices. (R. at 22).  However, during her testimony, Mrs. Brown mentioned that she sometimes uses a cane,

33

and that her trigeminal neuralgia causes her to lose her balance and stumble.  (R. at 421.)

Additionally, although the ALJ detailed Mrs. Brown's medical records which documented a history of back pain, hypertension, and migraine headaches, (R. at 20-23), there are numerous instances in the record that point to the improvement of Mrs. Brown's symptoms over time due to treatment, suggesting that her pain is not as disabling as she alleges.  For example, although Dr. Ponzio diagnosed Claimant with right shoulder impingement in 2003, he noted that her symptoms improved after steroid injections both in 2003 and again in 2004.  (R. at 295, 297, 300.)  Notably, at a later examination in 2003, Dr. Diaz-Jimenez did not diagnose Claimant with right shoulder impingement, nor did she complain of shoulder pain.  (R. at 20.)  While the ALJ did not specifically refer to each of these findings in his opinion, when discussing Dr. Ponzio's records, he made reference to Exhibit 2F, where these findings are contained.  (R. at 21.)

Taking into account the inconsistencies between Claimant's alleged symptoms of pain as compared to Claimant's host of daily activities, and the medical evidence documenting improvement of Claimant's symptoms over time with medication and other treatment, the Court finds that the record contains substantial

evidence to support the ALJ's credibility determination that Claimant's pain did not rise to the disabling degree alleged.

2.   Whether the ALJ Afforded Claimant's Treating

Physician's Opinion Appropriate Deference

A treating physician's medical opinion will be given controlling weight when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 416.927(d)(2).  Otherwise, the credibility of non-controlling medical evidence is evaluated by considering: (1) length of relationship and frequency of examination, (2) nature and extent of treatment relationship, (3) supportability of opinion in terms of the prevalence of medical signs and laboratory findings, (4) consistency with other medical evidence, (5) specialization of medical source and (6) other factors to include familiarity with the disability standards and procedures.  20 C.F.R. § 416.927(d)(1)-(6).  Indeed, the opinion of a treating physician is generally entitled to more weight than a one-time consultative examiner because treating physicians

> are likely to be the medical professionals
> most able to provide a detailed, longitudinal
> picture of  [a  Claimant's]  medical
> impairment(s)  and  may  bring  a  unique
> perspective  to  the  medical  evidence  that
> cannot be obtained from the objective medical
> findings alone or from reports of individual

35

> examinations,   such   as   consultative
> examinations or brief hospitalizations.

C.F.R. § 404.1527(d)(2); see Adorno, 40 F.3d at 48.  This is
particularly true "when the opinion reflects an expert judgment
based on a continuing observation of the patient's condition over
a prolonged period of time."  Rocco v. Heckler, 826 F.2d 1348,
1350 (3d Cir. 1987) (internal quotations omitted).

However, it is also well established that state agency
consultants are "highly qualified physicians . . . who are also
experts in Social Security Disability Evaluation."  20 C.F.R. §
404.1527(f)(2)(I); SSR 96-6p. Their opinions may constitute
substantial evidence in support of the Commissioner's findings,
Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991), as long as
they are supported by evidence in the case record, including
other medical opinions.  SSR 96-6p.  In fact, their opinions may
override those of treating physicians.  Alexander v. Shalala, 927
F. Supp. 785, 795 (D.N.J. 1995).  If choosing to reject a
treating physician's opinion, though, the ALJ must indicate the
basis for conclusions that a doctor's report is not credible,
Cotter, 642 F.2d at 706-07.

In carefully considering the totality of the medical
evidence, the ALJ properly accorded Dr. Ponzio's December 2003
opinion as to Claimant's RFC little weight, as it was not
supported by Dr. Ponzio's own objective findings, and it was

inconsistent with all recent testing on consultative examinations.  (R. at 24.)  As noted above, although Dr. Ponzio had diagnosed Claimant with right shoulder impingement in July 2003, (R. at 191), he had already noted a significant improvement in the condition by September of 2003, as a result of steroid injections.  (R. at 262.)  By January of 2004, only about a month after he completed the residual capacity assessment, Dr. Ponzio again noted that Claimant's shoulder had less pain and that her shoulder movements had improved.  (R. at 296.)  Thus, it is apparent that Claimant's symptoms were progressively improving over time.  In light of this, Dr. Ponzio's finding on the residual functional assessment that Mrs. Brown was significantly limited in her ability to use her right shoulder is not supported by his own records, considering that by September 2003, he had already noted significant improvement.  (R. at 262.)  Similarly, while Dr. Ponzio stated in his residual functional assessment that Claimant's ability to sit, walk, and stand was limited to less than two hours, and that she was precluded from stooping and crouching, during Mrs. Brown's examination that same day, Dr. Ponzio reported that she had no signs of any left lower radiculopathy as she had in the past.  (R. at 298).  The absence of pain in her lower left leg would seem to militate towards increased functional abilities, at least as far as sitting,

37

walking and standing are concerned.  However, according to the VE, an individual with the restrictive limitations Dr. Ponzio ascribed to Claimant does not have the capacity to perform even the full range of sedentary work.  (R. at 306-10.)

In addition to reviewing Dr. Ponzio's findings, the ALJ reviewed evidence from Drs. Diaz-Jimenez, Carta, Citta-Pietrolungo and Schneider. (R. at 20-24.)  Significantly, the ALJ noted that Dr. Diaz-Jimenez's physical examination of Mrs. Brown on June 16, 2003 revealed no significant objective findings except for lumbar pain and the inability to squat.  (R. at 20-21.)  The ALJ also described Dr. Carta's report dated April 2, 2004, in which a review of the EMG revealed a normal study of the right extremity.  (R. at 21.)  Likewise, Dr. Nolan who examined Claimant on November 14, 2005, reported that EMG and nerve conduction studies revealed only mild right carpal tunnel syndrome and very mild left carpal tunnel syndrome.  (R. at 21-22.)  Additionally, Dr. Nolan saw no evidence suggesting acute or chronic cervical radiculopathy involving the right or left upper extremities.  (R. at 22.)  Finally, each doctor, with the exception of Dr. Ponzio, stated that the Claimant had no manipulative limitations, (R. at 20-22), and even Mrs. Brown noted in her testimony that she could pick up small objects, although not on a prolonged basis.  (R. at 23.)  Taking into

38

account this body of medical evidence, both Dr. Citta and Dr. Schneider determined that Claimant had the residual functional capacity to perform the full range of sedentary work, (R. at 22, 24.) a much less restrictive assessment than that of Dr. Ponzio.

The ALJ ultimately afforded substantial weight to the opinion of Dr. Schneider, a state agency physician. (R. at 24.) Although Dr. Schneider simply reviewed Mrs. Brown's medical records without personally examining Mrs. Brown, and, as acknowledged by the ALJ, did not have access to the entire record before the court, (id.), his assessment was similar to that of Dr. Citta-Pietrolungo, a state agency physician who had examined Mrs. Brown,[11] and in some respects, was also consistent with some of Mrs. Brown's own testimony.[12]   Because Dr. Schneider's

---

[11] The differences between Dr. Citta-Pietrolungo's RFC assessment and Dr. Schneider's RFC assessment are that while Dr. Citta-Pietrolungo stated that Claimant could lift/carry up to ten pounds occasionally, was unlimited in her ability to walk, and had no environmental limitations, (R. at 395-397), Dr. Schneider found that Claimant could lift/carry up to twenty pounds occasionally, stand and or walk for at least two hours in an eight-hour day, and had multiple environmental limitations. (R. at 278-281.)  Notably, although Dr. Schneider's assessment of Claimant's lifting/carrying ability was less restrictive than that of Dr. Citta-Pietrolungo, Dr. Schneider's assessment with regard to Claimant's ability to stand/walk and her environmental limitations was much more restrictive than that of Dr. Citta-Pietrolungo.

[12] For example, in her January 27, 2005 hearing, consistent with Dr. Schneider's assessment of Claimant's ability to stand/walk at least two hours in an eight-hour day, Mrs. Brown testified that she could walk up to four or five hours without needing a break. (R. at 425-26.)  Mrs. Brown also testified that she could lift

assessment largely comports with the findings of the other examining and consultative physicians, as well as the preponderance of the medical evidence, the Court finds that the ALJ's reliance upon Dr. Schneider's testimony was supported by substantial evidence.

3.    Whether the ALJ Conducted A Proper Function-By-Function Assessment in Determining Claimant's RFC

The sequential evaluation process for determining disability requires an assessment of the claimant's functional limitations and her remaining capacities for work-related activities, referred to as the claimant's residual functional capacity ("RFC"). See SSR 96-8P. A claimant's RFC represents her maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.[13]  Id.  The RFC assessment is a function-by-function assessment based upon the relevant evidence of the claimant's ability to do work-related activities.  Id.  A function by function assessment includes an assessment of a plaintiff's physical abilities, mental abilities, and any other abilities affected by his impairments and how limitations regarding those abilities may affect his ability to

───────────────

and carry grocery bags weighing up to ten pounds, testimony that is consistent with Dr. Schneider's assessment that Claimant could lift/carry up to ten pounds frequently.  (R. at 454.)

[13] A "regular and continuing basis" means eight hours per day for five days a week, or an equivalent work schedule.  See SSR 96-8.

40

do work on a regular and continuing basis.  20 C.F.R. §§
416.945(b)(c)(d), 404.1545(b)(c)(d).   The assessment must
include a narrative discussion describing how the evidence
supports each conclusion, citing specific medical facts and non-
medical evidence.   <u>Id</u>.

     The assessment of the claimant's RFC is used at Steps Four
and Five of the sequential evaluation process to determine
whether the claimant is able to do past relevant work or other
work which exists in the national economy.   <u>Id</u>.  The ALJ must
consider all relevant evidence when determining an individual's
residual functional capacity at Step Four,  <u>Fargnoli v. Halter</u>,
247 F.3d 34, 41 (3d Cir. 2001), and must consider limitations
imposed by all of an individual's impairments, even those that
are not "severe."   <u>See</u> SSR 96-8.  Such evidence includes medical
records, lay evidence, effects of symptoms, including pain that
are reasonably attributed to a medically determinable impairment,
descriptions of limitations by the claimant and others, and
observations of the claimant's limitations by others.  <u>Fargnoli</u>,
247 F.3d at 41; <u>see</u> <u>also</u> SSR 96-8p.  Additionally, the ALJ's
findings of residual functional capacity must "be accompanied by
a clear and satisfactory explanation of the basis on which it
rests."  <u>Cotter</u>, 642 F.2d at 704.

In this case, the Court concludes that by neglecting to discuss the impact of Claimant's migraine headaches on her ability to perform her past regular work on a regular and continuing basis, the ALJ failed to conduct a proper function-by-function assessment.  In his opinion, the ALJ briefly described Mrs. Brown's past work as a Case Worker and Case Manager and noted that the VE had testified that these jobs were classified as sedentary by the DOT.  (R. 24-25, 47-78.)  The ALJ then described sedentary work as work which "involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools."  (R. at 25.)  The ALJ also noted that while a sedentary job by its nature "involves sitting most of the time, a certain amount of walking and standing is often necessary in carrying out job duties." (Id.)  Although not referenced within the opinion, the definition used by the ALJ in defining sedentary work is identical to the language used in SSR 83-10.  SSR 83-10 additionally states that sedentary jobs require walking and standing occasionally, and defines "occasionally" as "occurring from very little up to one third of the time."  The regulations further advise that "periods of standing or walking should generally total no more than about two hours of an eight hour workday, and sitting should generally total approximately six hours of an eight hour workday."

Finally, SSR 83-10 notes that most unskilled sedentary positions require repetitive hand-finger action.  This last requirement was echoed by the VE who testified that most sedentary jobs require bilateral dexterity and frequent hand use.  (R. at 486, 488.)

While the ALJ did not actually discuss Mrs. Brown's ability to lift and carry the mentioned articles, or her ability to sit, stand and walk for the requisite hours within the workday, the ALJ did conclude that Mrs. Brown had the residual functional capacity to lift ten pounds frequently, to stand and walk at least two hours in an eight-hour day, and sit six hours in an eight hour day.  Because this Court has already concluded that this assessment was supported by substantial evidence in the record, the ALJ's conclusion that Mrs. Brown has the capabilities to perform those functions of her past relevant work was reasonable.  Similarly, although the ALJ did not expressly discuss how Claimant's carpal tunnel syndrome would impact her ability to engage in tasks requiring bilateral dexterity, this Court will assume that a discussion is absent due to the ALJ's findings that Claimant had no manipulative limitations.  Because this Court has also already concluded that this assessment was supported by substantial evidence in the record, the ALJ's conclusion that Mrs. Brown would be capable of performing those functions of her past relevant work was also reasonable.

While the ALJ correctly concluded, in conducting the function-by-function assessment, that Mrs. Brown is capable of performing the physical tasks of her past relevant work, the ALJ failed to discuss Claimant's ability to perform these tasks on a continuing and regular basis.  Specifically, the ALJ did not consider how Claimant's migraine headaches and trigeminal neuralgia would impact her ability to sustain her work performance, particularly in light of the VE's testimony that an individual suffering migraines would likely not be able to hold any job in the national economy due to excessive absenteeism. (R. 488-98.)  While, as noted above, the ALJ did find that Mrs. Brown's subjective symptoms of pain were not credible to the degree alleged, (R. at 23-24), it is unclear whether this credibility determination extends to Mrs. Brown's testimony regarding the extent and severity of her trigeminal neuralgia and migraines, as the ALJ did not provide any discussion of this testimony, nor did he cite to any medical evidence to contradict it.  It appears that Claimant's doctors credited her complaints of neuralgia and migraines and prescribed medications for each on a consistent basis.  Thus, the medical evidence referred to in the opinion merely documents Claimant's chronic headaches and diagnosis of trigeminal neuralgia without referring to whether these symptoms improved over time.  Indeed, the ALJ recognized

44

that her "severe" impairments included trigeminal neuralgia and migraine headaches.  No explanation is offered for the ALJ's conclusion (R. at 23) that Claimant's trigeminal neuralgia and migraine headaches do not prevent her from performing her past relevant work.  On remand, the ALJ should reconsider and make findings of the intensity and frequency of these conditions tied to the record, and determine whether these conditions are disabling in light of the VE's opinion that an individual suffering from biweekly migraines lasting approximately two days in each episode could not sustain gainful employment.  Even if the ALJ ultimately determines on remand that Claimant's migraines and trigeminal neuralgia are not disabling to the extent alleged, the ALJ is still required to consider all the evidence, to offer a basis for any conclusions drawn, and to explain his reasoning for rejecting or discrediting competent evidence.  See Ogden, 677 F. Supp. at 278; Boot, 618 F. Supp. at 79.

Because the ALJ failed to address Claimant's ability to perform her past work on a regular and continuing basis in conducting the function-by-function assessment, the ALJ's determination at Step Four cannot be said to be supported by substantial evidence in the record.

**IV.   CONCLUSION**

For the reasons stated above, this Court will remand to the ALJ for further consideration of whether Claimant's RFC precludes her from performing her past relevant work on a regular and continuing basis when conducting a function-by-function assessment of her work-related abilities and limitations in accordance with 20 C.F.R. §§ 416.945(b)-(d), 404.1545(b)-(d), with respect to her pain associated with migraine headaches and trigeminal neuralgia.  The accompanying Order is entered.


**March 12, 2008**                    **s/ Jerome B. Simandle**
DATE                                  JEROME B. SIMANDLE
                                      United States District Judge

46